UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ANTONIO YARBOUGH,

                Plaintiff,

             -against-

THE CITY OF NEW YORK, PHILLIP GRIMALDI, in his individual capacity; JOHN DECARLO, in his individual capacity; PETER MCMAHON, in his individual capacity; ARTHUR WILLIAMS, in his individual capacity; ROBERT IZZO, in his individual capacity; EDWARD FEIT, in his individual capacity; FNU MURNANE, in his individual capacity; LIEUTENANT JAMES LUONGO, in his individual capacity; RICKY BRADFORD, in his individual capacity; Police Officer FNU VENEAIZA, in his individual capacity; Dr. JONATHAN ARDEN, in his individual capacity; and OTHER AS-YET-UNKNOWN OFFICERS & SUPERVISORS JOHN and JANE DOES # 1–10

             Defendants.

---

**COMPLAINT AND JURY DEMAND**

**15-CV-516**

Plaintiff ANTONIO YARBOUGH, by his attorneys, Zachary Margulis-Ohnuma and Philip Smallman complaining of the defendants, respectfully alleges as follows:

## Table of Contents

PRELIMINARY STATEMENT ................................................................... 3

JURISDICTION ........................................................................................... 5

VENUE ......................................................................................................... 6

JURY DEMAND ........................................................................................... 6

PARTIES ....................................................................................................... 6

FACTS ......................................................................................................... 13

A.  Overview ................................................................................... 13

B.  Background ............................................................................... 15

C.  The Evening of June 17, 1992 ................................................ 15

D.  Antonio Yarbough Discovers and Reports the Murders of His Mother, His Sister, and His Sister's Friend ...................... 17

E.  The Detectives Study the Crime Scene for Details Known Only to the Perpetrators ............................................ 21

F.  Witnesses Provide Detectives with Detailed Descriptions of the Likely Killers .............................................................. 23

G.  Detectives Invent an Initial "False Exculpatory" Statement by Antonio Yarbough to Justify Their Coercive Interrogation ........................................................... 25

H.  Led by Lt. Luongo, the Detectives Devise an Interrogation Plan Calculated to Elicit False Confessions ................................ 27

I.  Detectives Coerce Fifteen-Year-Old Sharrif Wilson into Telling Them What They Want to Hear ................................. 29

J.  Detectives Coerce Antonio Yarbough into Signing a False Written "Confession" ........................................................... 34

K.  Detectives Fabricate Evidence Regarding Two Serrated Steak Knives  40

L.  The Detectives Manipulate Sharrif into Making a False Confession on Videotape to an Assistant District Attorney ...................... 41

M.  Dr. Jonathan Arden Provides Fabricated Information Regarding the Time of Death .......................................................... 44

N.  Sharrif Wilson is Wrongly Convicted, then Coerced into Testifying Falsely Against Antonio ..................................... 45

O.  Detectives and Prosecutors Coerce and Manipulate Major Yarbough and Clara Knox into Changing their Stories and Testifying Falsely ........ 50

P.  Officer Ricky Bradford Falsely Tells Prosecutors that Antonio Appeared Calm and Unaffected After the Murders ............................. 51

Q.  Antonio Yarbough is Convicted, Sentenced to 75-Years-to-Life and Sent to Attica Correctional Facility .................................... 52

R.  DNA Evidence Proves that Antonio Yarbough is Actually Innocent of the Crime Charged and that His Conviction Was Wrongfully Procured ................................................................................. 53

Damages ............................................................................................ 56

FEDERAL CLAIMS ........................................................................ 58

COUNT I: 42 U.S.C. § 1983 Fifth and Fourteenth Amendment Claims for Violation of Antonio's Right Against Involuntary Self-Incrimination, His Right Not to be Deprived of Liberty as a Result of the Fabrication of Evidence by a Government Investigator, His Right to a Fair Trial, and His Right Not to be Deprived of Liberty without Due Process of Law .................................................................................. 58

COUNT II: 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Malicious Prosecution ........................................................ 63

COUNT III: 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Failure to Investigate Available Exculpatory Evidence, under *Russo v. City of Bridgeport* .............................................................. 66

COUNT IV: 42 U.S.C. § 1983 Civil Rights Conspiracy ............................ 68

COUNT V: 42 U.S.C. §1985(3) Conspiracy ............................................. 70

COUNT VI: 42 U.S.C. § 1983 Failure to Intercede ................................... 72

COUNT VII: 42 U.S.C. § 1983 Supervisory Liability ................................ 73

COUNT VIII: 42 U.S.C. § 1983 Monell Claim for Unconstitutional Custom or Policy ........................................................................ 76

STATE LAW CLAIMS ............................................................................ 77

COUNT IX: Malicious Prosecution .......................................................... 77

COUNT X: Intentional, Reckless or Negligent Infliction of Emotional Distress ................................................................................... 79

COUNT XI: Negligence ............................................................................ 80

COUNT XII: *Respondeat Superior* Claim Against the City of New York .. 82

## PRELIMINARY STATEMENT

1.     This is an action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §§ 1983, 1985 and 1988 for violations of the civil rights, as secured by said statutes, the common law, and the Constitutions of the State of New York and the United States, of Antonio Yarbough ("Antonio") who was wrongfully convicted of the 1992

homicides of his mother, his twelve-year-old sister and another twelve-year-old girl.

2.      As detailed below, the named defendants and others willfully and intentionally conspired to frame Antonio, who was 18 at the time, and his friend Sharrif Wilson ("Sharrif"), who was 15, for the three murders. The defendants were motivated, in part, by animus against African-Americans and lesbian, gay, bisexual and transgender ("LGBT") people. In 2013, DNA evidence proved that the real killer got away and went on to kill again seven years later, raping and strangling Migdalia Ruiz, a 35-year-old drug addict, in Sunset Park, Brooklyn. Antonio and Sharrif were finally exonerated and released based on the new DNA evidence on February 6, 2014. Sharrif passed away in January 2015, less than a year after his release. Antonio lives in Queens and works at the New York Hilton hotel, but struggles every day under the weight of the loss of his family, the psychological torture that the defendants inflicted on him after he reported the murders and in the course of two trials, and the twenty-two wasted years he spent in Attica Correctional Facility as a result of the cowardly and dishonest conduct of the defendants.

## JURISDICTION

3.     Antonio Yarbough brings this action for compensatory and punitive damages, affirmative and equitable relief, an award of costs and attorney's fees, and such other and further relief as this Court deems equitable and just.

4.     This action is brought pursuant to 42 U.S.C. § 1983 *et seq*. to redress the deprivation under the color of law of Antonio Yarbough's rights as secured by the United States Constitution.

5.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

6.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Mr. Yarbough's claims brought under the laws of the State of New York.

7.     Mr. Yarbough has complied with the requirements of New York General Municipal Law Section 50-I by making and serving a notice of claim on the Comptroller of the City of New York on April 11, 2014.

8.     The notice was served within the time required by the New York General Municipal Law Section 50-e.

9.     More than thirty days have elapsed since the service of that notice and no offer of settlement has been made.

10.     At the request of the City of New York, Mr. Yarbough submitted to a hearing pursuant to New York Municipal Law Section 50-h on July 24, 2014.

## VENUE

11.     Venue is properly laid in the Eastern District of New York under U.S.C. § 1391(b), because this is the district in which the claim arose and plaintiff currently resides in this district and resided in this district in 1992.

## JURY DEMAND

12.     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

## PARTIES

13.     Plaintiff ANTONIO YARBOUGH ("Antonio") is an openly gay African-American man, a citizen of the United States, and has been at all relevant times a citizen and resident of the City and State of New York.

14.     Defendant CITY OF NEW YORK was and is a municipality that is a political subdivision of the State of New York, was the employer of

the individual defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices and customs of the New York City Police Department ("NYPD") and the Office of the Chief Medical Examiner of the City of New York ("OCME").

15.     Defendant CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and police department authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

16.     Defendant Detective Phillip Grimaldi was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

17.     Defendant Detective John DeCarlo was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and in his individual capacity within the scope of his

employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

18.   Defendant Detective Peter McMahon was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

19.   Defendant Detective Arthur Williams was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

20.   Defendant Detective Robert Izzo was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting

under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

21.     Defendant Detective Edward Feit was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

22.     Defendant Detective FNU Murnane was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

23.     Defendant Lieutenant James Luongo was at all times relevant to this Complaint a duly appointed and acting lieutenant of the NYPD, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

24.     Defendant Police Officer Ricky Bradford was at all times relevant to this Complaint a duly appointed and acting police officer of the NYPD, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

25.     Defendant Police Officer FNU Veneaiza was at all times relevant to this Complaint a duly appointed and acting police officer of the NYPD, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. His first name is unknown. He is entitled to indemnification under

New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

26.     Defendant Detective John Doe #1, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #1," was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

27.     Defendants Does #2 through 10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those officers, detectives, supervisors, and/or other agents and employees of the NYPD or the OCME, acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein. They are entitled to indemnification under

New York General Municipal Law Section 50-k and by contract. They are sued in their individual capacities.

28.     Defendant Dr. Jonathan L. Arden at all times relevant to this complaint was a duly appointed and acting deputy chief medical examiner in the OCME, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

29.     At all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

30.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of and in furtherance of their employment by defendant THE CITY OF NEW YORK.

# FACTS

### A.    Overview

31.    On the morning of June 18, 1992, Antonio Yarbough came home to find the murdered bodies of his mother, his little sister, and a family friend at his apartment in the Carey Gardens housing project in Coney Island. They had been tied up, stabbed, and garroted with electrical cords. Antonio immediately reported the crime to the police and proceeded to the local precinct in a police car to assist in the investigation. But rather than try to solve the murders, detectives from the 60th Precinct, Brooklyn South Homicide and the New York City Housing Police PSA #1 falsely accused Antonio and his friend, Sharrif Wilson ("Sharrif"), of killing the three people. The police supported their false accusations by coercing Sharrif into falsely confessing on videotape and by manipulating Antonio into signing his name to a false account of the incident written out by detectives. Antonio Yarbough was 18 at the time. Sharrif Wilson was 15.

32.    Antonio spent the next 21 years, seven months and 19 days of his life in custody for a crime he did not commit. He endured two trials—the first ended in a hung jury—and saw the authorities coerce Sharrif Wilson into falsely testifying against him twice. Sharrif recanted his own confession and his accusations against Antonio before, between and after Antonio's two

13

murder trials. Other than Sharrif's false testimony and Antonio's false confession, no evidence of any kind linked Antonio to the murders. The day his mother and sister were killed, just a few weeks after his eighteenth birthday, Antonio was left with no family, falsely accused of doing the worst thing that ever happened to him, and thrown into one of the most brutal and unforgiving prison systems in the United States. Antonio Yarbough lost everything he ever had in a few hours on June 18, 1992: a drug-crazed psychopath took his family; corrupt, lying officials took away his freedom, dignity, and humanity.

33.     On July 19, 2010, Antonio filed motion papers seeking, *inter alia*, DNA testing of physical evidence from the scene. The DNA results did not come back until three years later: in the summer of 2013, OCME matched DNA under the fingernails of Antonio's mother to DNA found in the vagina of the victim of the 1999 rape and homicide of Migdalia Ruiz, which happened while Antonio and Sharrif were in prison. Antonio and Sharrif were finally freed based on the newly discovered DNA evidence on February 6, 2014. This lawsuit seeks compensatory and punitive damages against the police officers whose lies robbed Antonio—provably innocent from the start—of those nearly 22 years.

**B.     Background**

34.     In June 1992, Antonio Yarbough was 18. Sharrif Wilson was 15. They were both gay. Antonio was mostly open about his sexuality with his family and friends. Antonio and Sharrif were friends with each other for several months but they were not involved in a romantic or sexual relationship with each other.

35.     Antonio lived with his mother, Annie Yarbough, and his half-sister, Chavonn Barnes, at 2836 W.23rd Street, Apartment 1-N ("the Yarbough apartment"). This unit was a two-bedroom apartment in a public housing project called Carey Gardens.

36.     Annie Yarbough had multiple health problems. She was unable to walk without a cane that she kept at her side at all times. She normally slept in her chair near the front door to the apartment. She was being treated for heroin addiction in a methadone clinic at Coney Island Hospital.

37.     Antonio's sister, Chavonn Barnes, was a middle school student.

**C.     The Evening of June 17, 1992**

38.     On June 17, 1992, Antonio went out for the evening with some friends including Sharrif Wilson. Sharrif, who lived in the Bronx, had stayed the night before with a friend named Shawn Jones who lived near Antonio in

Coney Island. Sharrif was planning to stay at Shawn's apartment for a few more days.

39.     Annie Yarbough was expecting visitors from the methadone clinic to visit her at the Yarbough apartment the next day, June 18, 1992.

40.     Antonio had agreed to be home by 7 a.m. that morning in order to help his mother get his sister ready for school and to clean the apartment before the people from the clinic arrived later that day.

41.     The two twelve-year-old victims, Chavonn Barnes and Latasha Knox, slept at the Yarbough apartment that night.

42.     Annie Yarbough was at the Yarbough apartment that evening, using drugs. Other people, including at least Charnette Loyal, Clara Knox, and two unidentified male drug users, came and left the apartment that evening and after midnight the following morning. As detailed below, Charnette Loyal, who was Annie Yarbough's common-law daughter-in-law, witnessed one of the men threaten Annie Yarbough with a knife in a dispute over drugs. Clara Knox, Latasha's grandmother, was the last person to see the three victims alive. When she left the apartment at about 1:30 a.m., there was an unidentified male still there with Annie Yarbough and the two girls were asleep in another room. The male appeared to be high.

43.    At some point after Clara Knox left at 1:30 a.m., at least one man attacked Annie Yarbough and the two girls by stabbing them, garroting them with electrical cords, tying their limbs with clothing, and sexually abusing the two girls. During this struggle, Annie scratched at one of her attackers, which left his DNA under Annie's fingernails.

### D.    Antonio Yarbough Discovers and Reports the Murders of His Mother, His Sister, and His Sister's Friend

44.    Sometime around 4 a.m. on June 18, 1992, Antonio and Sharrif were driven by an individual named Ron Carrington from Manhattan to Prospect Park in Brooklyn.

45.    Antonio and Sharrif went into Prospect Park shortly after 4 a.m. and remained in the park until daybreak, around 6 a.m.

46.    At around daybreak, Antonio and Sharrif walked to the D subway train and rode it to the Stillwell Avenue station in Coney Island.

47.    Just after 6:25 a.m., Antonio and Sharrif were observed by Antonio's aunt, Sandra Vivas, walking from the Stillwell Avenue station in Coney Island towards Carey Gardens.

48.    At approximately 6:30 a.m. or a few minutes later, Antonio and Sharrif were observed by Dorothy Ferrer on a bench in front of 2836 West 23rd Street in Coney Island.

17

49.     Antonio and Sharrif were laughing and talking and eating on the bench at that time.

50.     Sometime after 6:30 a.m., Sharrif proceeded to the building where he was staying, at 2949 West 23rd Street to find Shawn Jones.

51.     After Sharrif left, Antonio went into his building at 2836 West 23rd Street.

52.     Neighbors observed Antonio enter the building by himself, without Sharrif.

53.     When he arrived at his apartment, Antonio noticed that the door was open.

54.     The apartment was dark and Antonio could not see very well.

55.     Annie Yarbough was not in her chair near the door.

56.     Annie Yarbough's cane was on the floor.

57.     The door to Antonio's room, which is normally closed, was open.

58.     Antonio proceeded to the back of the apartment, into his room, where he saw his mother with her hands tied in front of her, lying on the bed.

59.     When Antonio tried to shake his mother awake, she did not answer him.

60. Antonio ran to look for his half sister, Chavonn Barnes. He found her lying on the floor in the back bedroom.

61. Antonio ran out of the apartment onto 23rd Street.

62. While Antonio was in the apartment, his uncle, Major Yarbough, also known as "Sonny," was waiting for a bus on 23rd Street with his child, who was disabled.

63. When Antonio ran out of the apartment, he saw Major Yarbough and the child waiting.

64. Antonio was visibly upset at that time.

65. Antonio was crying.

66. Antonio told Major Yarbough that he thought everybody in his apartment was dead.

67. Antonio told Major Yarbough that he was afraid to return to the apartment by himself.

68. As soon as the bus came for Major Yarbough's disabled son, Major Yarbough took Antonio back to the building.

69. Major Yarbough looked through the door into the apartment and saw the body of a girl lying on the couch.

70. Major Yarbough took Antonio across the hall to call the police from a neighbor's phone.

71.     The neighbor, identified as "Miss Mary," dialed the police; Antonio or his uncle spoke to the police dispatcher.

72.     A few minutes later, at about 7:20 a.m., two uniformed police officers, defendants Ricky Bradford and his partner FNU Veneaiza, arrived at the apartment building.

73.     At the time the officers arrived, Antonio was crying and visibly upset.

74.     Officer Bradford and Officer Veneaiza brought Antonio back into the apartment.

75.     One of the officers shined a flashlight on the body of the girl on the couch in the living room.

76.     Antonio recognized the body as that of his sister's friend, Latasha Knox.

77.     Antonio started crying audibly again.

78.     Seeing that Antonio was distraught, one of the officers asked Antonio to wait outside.

79.     Antonio waited in a police car.

80.     Antonio's common-law sister-in-law, Charnette Loyal, and his aunt, Carla Hearns, arrived shortly thereafter.

81.    At some point, Sharrif Wilson returned to the area in front of the building and saw Antonio in the police car. He asked a police officer if he could get in the car with Antonio.

82.    Antonio was visibly upset this whole time about the murders of his family.

83.    During this time, Sharrif was supportive of Antonio and comforting him over the loss of his family.

84.    There was no physical evidence of any violence such as blood, scratches or other injuries, on Antonio.

85.    There was no physical evidence of any violence such as blood, scratches or other injuries, on Sharrif.

86.    Sharrif and Antonio both went willingly and voluntarily to the precinct.

87.    Antonio informed the police that he wanted to help them.

88.    Antonio, Sharrif, Carla Hearns and Charnette Loyal arrived at the 60th precinct sometime before 10:30 a.m. on June 18, 1992.

**E.    The Detectives Study the Crime Scene for Details Known Only to the Perpetrators**

89.    Officers Bradford and Veneaiza called in the murder.

90.    A team of detectives responded and walked through the crime scene. The crime scene was cordoned off, and the Crime Scene Unit ("CSU") was called, as was the Office of the Chief Medical Examiner ("OCME").

91.    The lead detective assigned to the investigation was defendant Phillip Grimaldi.

92.    Defendants John DeCarlo of Brooklyn South Homicide and Peter McMahon of the Housing Police were also assigned to the team.

93.    Grimaldi, DeCarlo, McMahon and other detectives walked through the crime scene and looked around each room in the apartment. When CSU arrived, the detectives walked through the crime scene again with the crime scene officers and observed their examination. Finally, an investigator from OCME arrived and Grimaldi, McMahon, and DeCarlo received an oral preliminary report of his findings.

94.    From these examinations, Dets. Grimaldi, McMahon and DeCarlo learned that there were electrical cords tied around the victims' necks and that the cords appeared to have been cut from appliances in the apartment.

95.    The electrical cords were under clothing that had been wrapped around the victims' necks.

96.     The detectives further noted the positioning of each of the bodies, the locations and estimated number of stab wounds on each victim, and that both twelve-year-old victims were partially undressed. Annie Yarbough was dressed.

**F.     Witnesses Provide Detectives with Detailed Descriptions of the Likely Killers**

97.     At some point on June 18, 1992, Charnette Loyal provided detectives with information about two men who threatened Annie Yarbough the night before.

98.     Charnette Loyal told police the following: on the evening  of June 17, 1992, she was using crack cocaine in the kitchen of Annie Yarbough's apartment. Annie was present with two men. One of the men was a white male named Vinnie. Annie gave Vinnie a "water shot" – i.e. poor quality drugs. In response, Vinnie pulled a knife on Annie and demanded his money back or another dose of heroin. He threatened to kill Annie with the knife, which was a "007 knife." Ms. Loyal agreed to go out and get his money for him. Vinnie then left but said he would be back at 10 p.m. Ms. Loyal left a moment later, but did not return until she heard about the murders the next morning. Vinnie was 40 to 45 years old, 6'1" to 6'2" tall with wire-rimmed glasses, blue eyes, his left eye cocked, and sandy

blond hair. He had met Annie at the Coney Island Hospital methadone clinic.

99.    Detectives took contemporaneous notes of their interview with Ms. Loyal in their memo books and notepads but they failed to produce the standard DD-5 investigation report documenting the interview and the information provided in it.

100.    Clara Knox also told police about seeing one or more men in Annie Yarbough's apartment in the early morning of June 18, 1992. She told defendant Detective Edward Feit that she had been in the apartment at approximately 1:10 a.m. on the morning of June 18, 1992 and that she had seen Annie Yarbough and another man who appeared to be Hispanic injecting themselves with intravenous drugs.

101.    Detectives made no effort to identify "Vinnie."

102.    Detectives made no effort to identify the other unidentified male who was with Annie Yarbough just before the murders.

103.    Detectives made no effort to investigate the conflict between Annie Yarbough and the men in the apartment that night.

104.    Detectives made no effort to identify any of Annie Yarbough's other drug associates.

### G.   Detectives Invent an Initial "False Exculpatory" Statement by Antonio Yarbough to Justify Their Coercive Interrogation

105.   After they arrived at the 60th Precinct on June 18, 1992, Antonio and Sharrif were separated and questioned individually about their whereabouts the night before.

106.   In the early 1990s, at the height of the HIV/AIDS epidemic, gay men experienced heightened social stigma. False, discriminatory beliefs about gay men—including stereotypes that gay men were generally less moral and specifically engaged in reckless and destructive sexual activity including hypersexuality and pedophila—were commonly held. These discriminatory beliefs were particularly strong against gay men of color, who were subject to both homophobic and racist stereotyping.

107.   Sometime in the morning on June 18, 1992, Antonio was interviewed by the defendants Detective Robert Izzo and Detective Arthur Williams.

108.   At that interview, Antonio told Det. Izzo the truth about what had happened: that he and Sharrif were in Manhattan the night before, that they were driven by Ron Carrington to Prospect Park around 4 a.m., that they took the subway to Coney Island around 6 a.m., that they were in front

of the apartment after 6:30 a.m. and that Antonio alone discovered the

bodies a few minutes later.

109.   Antonio also told Det. Izzo that he was gay and participated and

competed in gay dances and that he had been hanging out late at night and

early in the morning in the West Village and Prospect Park, which are well-

known areas for LGBT people to socialize. He explained that lesbian, gay

and transgender people participate in the gay dances and dance competitions.

110.   At that interview, Antonio provided Det. Izzo with Ron

Carrington's beeper number.

111.   At some point that afternoon, Det. Izzo spoke by phone with

Ron Carrington.

112.   Ron Carrington told Det. Izzo exactly the same story as

Antonio had told him: that he drove Antonio and Sharrif to Prospect Park at

about 4 a.m.

113.   In order to falsely accuse Antonio Yarbough and justify the

aggressive interrogation of him, Det. Williams and Det. Izzo falsely

informed prosecutors that Antonio lied at that initial interview. The

detectives falsely claimed that Antonio told them that Ron Carington drove

Antonio and Sharrif to Coney Island at about 6 a.m., not to Prospect Park at

about 4 a.m. The detectives falsely claimed that Antonio told them that he

went to a party in Flatbush with Ron Carrington the night before. Antonio never said that.

114.    Det. Izzo also wrote this false account of the meeting in a DD-5.

115.    Around the same time as Antonio's initial interview, a rotating group of three to four detectives interviewed Sharrif Wilson over several hours.

116.    Sharrif told the detectives the truth: he had nothing to do with the murders of Annie Yarbough, Latasha Knox and Chavonn Barnes.

117.    Sharrif also truthfully corroborated Antonio's account of his whereabouts the night before.

### H.    Led by Lt. Luongo, the Detectives Devise an Interrogation Plan Calculated to Elicit False Confessions

118.    Prior to their aggressive interrogations, Dets. McMahon, Grimaldi, Williams and DeCarlo met with their supervisor, Lt. James Luongo to "plan" the interrogations.

119.    The planned interrogations led directly to the false confessions and the murder charges.

120.    Upon information and belief, by the time of that meeting with Lt. Luongo, the detectives had decided to conduct aggressive interrogations

of both Antonio and Sharrif. Implicitly or explicitly, they agreed to use any techniques necessary to extract confessions from Antonio and Sharrif, without regard to whether or not the confessions were accurate or reliable. These techniques included lying to Antonio and Sharrif, feeding them non-public facts about the murders, hitting them, threatening them with guns, and depriving them of sleep. Implicitly or explicitly, Lt. Luongo approved and permitted the use of such techniques in this particular case, which was consistent with prevailing practices among New York City police detectives at the time.

121.   Lt. Luongo was present at the 60th Precinct throughout the day and supervised the interrogations over the next several hours.

122.   Lt. Luongo personally participated in portions of the interrogations of Sharrif Wilson and Antonio Yarbough described below.

123.   Upon information and belief, Lt. Luongo was present for misconduct by the other defendant officers, including the unconstitutional coercion and fabrication described below.

124.   Lt. Luongo knew or should have known that, while he was present, the defendant officers were engaging in misconduct, including the unconstitutional coercion and fabrications described below.

### I.   Detectives Coerce Fifteen-Year-Old Sharrif Wilson into Telling Them What They Want to Hear

125.   In the early afternoon of June 18, 1992, Dets. Grimaldi, DeCarlo and McMahon interrogated Sharrif Wilson.

126.   During this interrogation, they provided Sharrif with non-public facts that they had gathered earlier from the crime scene.

127.   The detectives also told Sharrif their theory of the motive for the murders, which was that they believed Sharrif and Antonio were both gay and that Antonio's mother disapproved of them being together.

128.   This theory was, in fact, false. Sharrif and Antonio were not in a romantic relationship. Antonio's mother accepted her son's identity.

129.   During this interrogation, Sharrif told the detectives that he was only 15 years old.

130.   Moreover, it would have been apparent to any reasonable law enforcement officer that Sharrif was under 17 based on his appearance.

131.   The detectives were aware that, under New York law, before questioning a person under 16, they were required to notify a parent or legal guardian that the child was in custody and they intended to question him.

132.   The detectives were also aware that they were required to follow special NYPD policies regarding questioning children.

133.   The detectives did not notify a parent or other legal guardian that Sharrif was in custody or that they wanted to question him.

134.   The detectives filed false DD-5s claiming that Sharrif had said he was 17 years old.

135.   The detectives falsely informed prosecutors that Sharrif claimed he was 17 years old.

136.   The detectives engaged in coercive, threatening tactics during Sharrif's interrogation, including but not limited to sleep deprivation, verbal threats and physical assault and battery.

137.   Sharrif had not slept the previous night and was exhausted. He was so tired that he nodded off repeatedly as the officers questioned him. Instead of allowing Sharrif to sleep, the detectives kept questioning him.

138.   Each time Sharrif fell asleep, a detective would slap him in the head or bang on the table to awaken him and again demand he confess.

139.   Three or four detectives interrogated Sharrif at a time, slapping him on his head, repeatedly slamming their hands on the table, and demanding that he tell them that he and Antonio Yarbough had strangled and stabbed the victims and then moved their bodies.

140.   Dets. Grimaldi, DeCarlo, and McMahon falsely told Sharrif that Antonio had already confessed.

30

141.   Sharrif repeatedly, and with mounting frustration and increasingly severe exhaustion, denied that he had been involved. The detectives failed to take any notes of this exculpatory portion of their interrogation and refused to accept Sharrif's truthful denials. Instead they made it clear to Sharrif that the interrogation would continue until Sharrif told them what they wanted to hear: that Sharrif and Antonio had strangled and stabbed the victims and then moved their bodies around the apartment.

142.   The interview room was small, and the three detectives were big. As the questioning continued Sharrif grew more and more afraid.

143.   Several times, the detectives, specifically including DeCarlo, followed the demand that Sharrif confess with another slap to Sharrif's head.

144.   Throughout the interrogation, Grimaldi, DeCarlo, McMahon, and the other detectives improperly fed Sharrif non-public facts about the murders that only the police and the true perpetrator could have known.

145.   The interrogating detectives insisted that Sharrif and Antonio had killed Annie Yarbough, Chavonn Barnes, and Latasha Knox. They refused to listen to Sharrif's truthful statements of innocence.

146.   After hours of interrogation, the investigators falsely promised Sharrif that if he just told them what they wanted to hear, they would let him go home.

147.   Sharrif's will was overborne by the detectives' tactics. Sharrif was tired and afraid, and felt scared and overwhelmed as the officers kept coming at him. He feared they could grow more aggressive with their use of physical force and more threatening at any moment. He became convinced the only way to end his ordeal was to tell the officers what they wanted to hear. After several hours, Sharrif succumbed and claimed that he and Antonio had committed the murders, so that he could go home as promised.

148.   The interrogating detectives Grimaldi, DeCarlo, and McMahon then took advantage of Sharrif's overborne will to fabricate and coerce a false confession from him. Sharrif was actually innocent, but the detectives coerced and manipulated him into giving a "confession" that appeared reliable and incriminating because it contained non-public facts about the crime that only the police and the true perpetrator could have known, including, but not limited to, that:

a.   Annie Yarbough, Chavonn Barnes, and Latasha Knox had been stabbed numerous times in their chests;

b.   Both of the twelve-year-old victims had their breasts exposed, but their underwear on;

c.   All three victims had clothing tied around their hands and feet;

32

d.     Electrical cords had been cut from the electrical appliances in

the apartment, including a radio and a fan; and

e.     Electrical cords that appeared to have been cut from those

electrical appliances were tied around each victim's neck.

149.   The detectives fed Sharrif that non-public information and then

misrepresented that it had originated with him. Sharrif did not volunteer any

of these non-public details. He could not because he was innocent and did

not know any non-public information about the crimes.

150.   The detectives prepared a false DD-5, claiming that Sharrif

Wilson confessed and provided details about the crime scene when in fact it

was the detectives who told Sharrif about the crime scene.

151.   The detectives falsely told prosecutors that Sharrif had

confessed.

152.   The detectives falsely told prosecutors that Sharrif had provided

non-public details about the crime scene.

153.   The detectives coached Sharrif to later make a false videotaped

confession.

154.   After overbearing Sharrif's will and forcing him to make a false

oral confession, the detectives finally allowed him to sleep and turned their

attention to extracting a similarly false confession from Antonio Yarbough.

**J.     Detectives Coerce Antonio Yarbough into Signing a False Written "Confession"**

155.   After Det. Izzo's initial interview with Antonio, police instructed Antonio to wait in the office where the interview took place.

156.   Several hours later, a detective brought Antonio to an interrogation room.

157.   Antonio had been awake for almost 24 hours when the interrogation began.

158.   Approximately five detectives were present in the interrogation room.

159.   The detectives in the interrogation room included defendants Grimaldi, McMahon, DeCarlo, Williams and others, including but not limited to defendant John Doe #1.

160.   During this second interrogation, Antonio was again open with the detectives about his sexual orientation, including that he participated and competed in gay dances and that he had been socializing the night before and that morning with other LGBT people in the West Village and later had gone to Prospect Park.

161.   During this second interrogation, the detectives, including but not limited to Grimaldi, McMahon, DiCarlo, and Williams, engaged in coercive and threatening interrogation tactics.

162.   The detectives immediately started accusing Antonio of participating in the murder of his mother.

163.   One of the detectives slammed down a Polaroid picture of Antonio's murdered mother's mutilated corpse and, at the same time, said, "You did this. Only a faggot would do this."

164.   One of the detectives shoved the photograph in Antonio's face and tried to force him to look at it.

165.   One of the detectives struck Antonio multiple times on the head and face with an open hand.

166.   One of the detectives threw a chair during the interrogation.

167.   Several of the detectives called Antonio a "faggot" and other derogatory names referring to his sexual orientation.

168.   The detectives stated "only a faggot would do something like this."

169.   One of the detectives grabbed Antonio by his clothing.

170.   One of the detectives said, "I will blow your brains out if you don't make a statement."

171.   When Antonio refused to sign the false confession, one of the detectives slapped Antonio on the back of the head.

172.   When Antonio refused to make a statement, one of the detectives unholstered his gun and said, in substance, "I could blow your brains out and get away with it by saying that you went for my gun."

173.   In order to further humiliate him, the detectives called Antonio a "crack baby."

174.   The detectives falsely told Antonio his family did not want to speak to him.

175.   Antonio was crying during the interrogation.

176.   Antonio asked to leave.

177.   The detectives told Antonio he could not leave.

178.   The detectives never informed Antonio of his *Miranda* rights.

179.   The detectives falsely told Antonio that Sharrif Wilson had already orally confessed.

180.   In order to manipulate Antonio, the detectives brought Sharrif into the interrogation room. Sharrif did not come voluntarily to Antonio's interrogation room. Rather, he was awakened by a detective, brought to the room and forced to falsely suggest to Antonio that he had confessed to the crimes.

181.   While Sharrif was in the room with Antonio, Sharrif told Antonio to "give up."

182.   This happened two times during Antonio's interrogation.

183.   John Doe #1, an unidentified detective who participated in the interrogation, was alone with Antonio near the end of the interrogation.

184.   While they were alone, John Doe #1 told Antonio that he believed he was innocent.

185.   While they were alone, John Doe #1 told Antonio that if he just signed a confession, the interrogation would end and he could tell the judge that the signature on the confession did not match the handwriting and that the words on the confession were not Antonio's. John Doe #1 falsely, wrongfully and maliciously advised Antonio that the judge would believe him under those circumstances.

186.   Upon information and belief, defendant officers Luongo, Grimaldi, DeCarlo, McMahon and Williams personally witnessed or were immediately made aware of the misconduct by John Doe #1. Such defendant officers and John Doe #1 failed to reveal to any assistant district attorney, the court or the juries that they advised Antonio that he could sign the confession that the police wrote out and would be believed if he later disavowed it.

187.   After that, Antonio signed a confession that the detectives had written out.

188.   None of the information in the written confession about the murders was provided by Antonio.

189.   The detectives asked Antonio to make specific changes on the written confession and to initial the changes.

190.   Antonio complied only so that he could end the interrogation, not because he actually intended to make any changes or "corrections."

191.   The purpose of the "corrections" the detectives asked Antonio to make was to deceive the prosecutors and jury into believing that the confession accurately reflected information provided by Antonio, even though the detectives knew that the information in the confession was not provided by Antonio.

192.   The Kings County District Attorney's office kept an assistant district attorney ("ADA") on call as the "riding" assistant district attorney who would take videotaped statements from suspects. Upon information and belief, the detectives contacted Peter Gray, who was the "riding" ADA that evening.

193.   ADA Gray arrived at the 60th Precinct late that evening and met with Det. Grimaldi to review the case.

194.   Upon information and belief, Dets. Grimaldi, McMahon, DeCarlo, Luongo, Izzo and Williams falsely reported to ADA Gray that

Sharrif and Antonio confessed after lawful interrogations. The detectives concealed from ADA Gray the following facts known to them: that (1) the detectives had provided non-public facts to Sharrif and Antonio; (2) Sharrif was only 15 years old; (3) the detectives had pressured Sharrif to "confess," including by hitting him, depriving him of sleep, threatening him and making him false promises; and (4) Antonio was denying committing the crime even as he was pressured into signing the false written confession using similar tactics. Rather, the detectives falsely told ADA Gray that (1) both defendants had confessed to them spontaneously and in narrative form; (2) Sharrif was 17 years old; (3) Sharrif and Antonio personally knew details from the crime scene that could be known only to the police and to the perpetrators; and (4) during Antonio's interrogation, Det. McMahon had written out a narrative confession as Antonio related the circumstances to him, that Det. McMahon then read the statement back to Antonio, and that Antonio initialed written corrections to the statement and signed it.

195.   Prior to asking Antonio to make the video statement, ADA Gray read Antonio his *Miranda* rights.

196.   That was the first time Antonio was advised of his rights by anyone.

197.   Antonio immediately asked for an attorney.

198.   As a result, Antonio did not make any statement regarding the crime on videotape.

### K.   Detectives Fabricate Evidence Regarding Two Serrated Steak Knives

199.   Det. Edward Feit and Det. Sgt. FNU Murnane reported that they returned to the crime scene at the Yarbough apartment at around the same time as Antonio was being interrogated on the evening of June 18, 1992.

200.   They claimed to "search" the crime scene again at that time.

201.   They reported that during the search, they recovered two steak knives. They claimed the first was recovered from a countertop in the kitchen and dining area adjacent to the stove. They claimed the second knife was recovered from the floor next to the west wall of the living room and adjacent to the left side of the couch.

202.   At the time they made this report, the detectives knew that the victims had suffered multiple sharp force traumas, and that the stabbing instrument or instruments had not yet been recovered.

203.   The crime scene had been thoroughly searched by CSU earlier in the day and no knives or other weapons had been found or recovered.

204.   Upon information and belief, in order to shore up Sharrif's false and fabricated confession, Dets. Feit and Murnane either searched for any knife they could find in the apartment and then reported the type of knife they found back to the detectives who were interrogating Sharrif, or Dets. Feit and Murnane planted two steak knives that did not actually come from the crime scene and then falsely reported to prosecutors and in their written reports that the knives were recovered from the scene. Dets. Feit and Murnane reported back to Grimaldi and the other interrogating detectives that the weapons they would be reporting as "recovered" from the crime scene were two steak knives.

**L.      The Detectives Manipulate Sharrif into Making a False Confession on Videotape to an Assistant District Attorney**

205.   Detectives persuaded Sharrif Wilson to falsely confess on videotape shortly after 11 p.m. on June 18, 1992.

206.   Just prior to making the videotape, the detectives told Sharrif that the knives used in the crime were steak knives. Before the video was made, the detectives coached Sharrif to tell the assistant district attorney making the videotape that the knives used in the crime were two steak knives. They also told him that he had to convince the ADA that he and Antonio really committed the murders.

207.   Sharrif had no independent knowledge of what knives or other weapons were used in the murders or recovered from the crime scene.

208.   The detectives knew that Sharrif had no knowledge of the murder weapons or any other details relating to the murders.

209.   More than twelve hours after Sharrif arrived at the 60th Precinct, sometime after 11 p.m. that night, Sharrif gave a false videotaped statement, implicating himself and accusing Antonio of the murders. By this time, Sharrif had been awake for well over 24 hours. He was permitted only a limited time to rest after he agreed to give the false confession earlier in the day. Before that point, every time he tried to rest, detectives struck him in the head or pounded on the table to wake him up.

210.   In his videotaped confession, Sharrif falsely claimed that steak knives were used in the crime, recited details of the crime scene that the police had fed him, and falsely asserted that the murders were the result of an argument between Antonio and his mother over bringing Sharrif to the apartment.

211.   The interview was conducted by ADA Gray but Dets. Grimaldi and McMahon were present in the room when it was conducted and ensured that Sharrif stuck to the story they gave him.

212.   Dets. Grimaldi, McMahon, Williams and DeCarlo created a false account of the interrogation and its result by (1) not video- or audio-taping any of Sharrif's interactions with detectives over the prior twelve hours, (2) failing even to take notes of their exculpatory interviews of Sharrif, (3) selectively videotaping only the end result of their interrogation, and (4) falsely summarizing what occurred during their lengthy interrogation of Sharrif earlier that day in a false and misleading DD-5 report.

213.   The final videotape, however, falsely appeared to be highly inculpatory when not seen in the context of the events that preceded it because it appeared to show not only that Sharrif voluntarily admitted to the murders but that his admissions were reliable because they included non-public details about the crime scene and a motive. However, the video only had evidentiary value when viewed in the context of the detectives' false statements to the assistant district attorney that (1) they did not coerce Sharrif to make the video; (2) earlier in the day, Sharrif had confessed spontaneously shortly after the questioning began; and (3) the non-public details about the crime originated with Sharrif and were not fed to him by the detectives.

214. Sharrif Wilson and Antonio Yarbough were arrested for the murders of Annie Yarbough, Chavonn Barnes and Latasha Knox on June 18, 1992.

### M. Dr. Jonathan Arden Provides Fabricated Information Regarding the Time of Death

215. The next day, June 19, 1992, defendant Dr. Jonathan Arden conducted the autopsies of the three murder victims.

216. Dr. Arden was aware that, based on the condition of the bodies at the time they were found, the murders occurred prior to 4:30 a.m. on June 18, 1992.

217. Specifically, Dr. Arden was aware that (1) a medical investigator named Dr. Eckert observed all three bodies in "full" or "fixed" *rigor mortis* at approximately 10:25 a.m., (2) Dr. Eckert observed Latasha Knox's body was "cool to the touch" at that time and (3) the autopsy showed that the victims' stomachs contained thick liquid, indicating they had eaten within a few hours before their deaths.

218. Upon information and belief, Dr. Arden spoke to the detectives and was told that (1) Antonio and Sharrif had supposedly admitted to committing the murders after 6:30 a.m. and (2) Antonio and Sharrif had alibis for the time period prior to 6:30 a.m.

219.   Dr. Arden failed to include any opinion in his reports about the times of the deaths.

220.   Dr. Arden failed to further investigate or document information pertinent to the times of the deaths.

221.   Upon information and belief, Dr. Arden falsely stated to prosecutors and detectives that the murders could have taken place after 6:30 a.m., when Antonio and Sharrif were seen outside the apartment building.

222.   Despite the fixed *rigor mortis*, stomach contents and body temperatures observed on the bodies, Dr. Arden falsely testified at Antonio's second trial that the states of *rigor mortis* in the bodies, which indicate the times of death, were consistent with the murders taking place at or after 6:30 a.m. on June 18, 1992.

### N.   Sharrif Wilson is Wrongly Convicted, then Coerced into Testifying Falsely Against Antonio

223.   On or about June 24, 1992, Sharrif and Antonio were each indicted by a Kings County grand jury for three counts of second degree murder. The two cases were initially joined. Both Sharrif and Antonio were arraigned and pleaded not guilty.

224.   Both Sharrif and Antonio, through counsel, moved to suppress their false confessions. At the joint pre-trial *Huntley* hearing, Dets. Grimaldi

and Williams repeated their and McMahon and DeCarlo's out-of-court misrepresentations about the confessions and how they were obtained. The trial court denied the suppression motions.

225.   The two cases were severed and tried separately. Sharrif was tried first from on or about January 11, 1994 to on or about January 19, 1994.

226.   At his own trial, Sharrif testified truthfully that he and Antonio had nothing to do with the murders.

227.   Prior to Sharrif's trial, prosecutors offered him a plea agreement with a promised sentence of three-to-nine years if he would be willing to testify against Antonio. This offer was conveyed to Sharrif in writing through a letter to his lawyer. Sharrif initially accepted the agreement, but then renounced it as a result of his actual innocence.

228.   Insisting on his innocence and confident the truth would come out at trial, Sharrif declined that offer.

229.   At Sharrif's trial, Det. Grimaldi again gave false and misleading testimony, making the same misrepresentations to the Court and jury that he had previously made to prosecutors.

230.   In summations, Assistant District Attorney Suzanne Mondo emphasized Det. Grimaldi's testimony, arguing that Sharrif gave Det.

Grimaldi a statement "in excruciating detail about what [he and Antonio Yarbough] did to these people" and then again gave the statement on videotape.

231.   The false, involuntary, coerced and fabricated oral and videotaped confessions—along with the police misrepresentations about how they were elicited—constituted the only evidence of Sharrif's guilt that was presented at his trial.

232.   Sharrif testified in his own defense as best he could. He truthfully testified that both he and Antonio Yarbough were innocent of the crimes and that his videotaped statement was false. He explained to the jury that prior to making his statement he had been held in the precinct for hours; he had been tired and afraid; he had told the detectives he was 15 years old and they nonetheless questioned him without a parent present; he had been questioned by up to three detectives at a time; the detectives had insisted that he and Antonio had stabbed and strangled Annie Yarbough, Chavonn Barnes and Latasha Knox and then moved the bodies around the apartment; the detectives had hit him on the head and shouted at him; and the detectives had told him he could go home if he told them what they wanted to hear. But his testimony could not overcome the apparently powerful evidence of his proof presented by Grimaldi, Williams and DeCarlo's false testimony that

Sharrif knew and spontaneously recounted non-public facts about the murders.

233.   Based on the false videotaped confession and false testimony by Dr. Arden and the detectives, Sharrif was convicted of the three homicides on or about January 19, 1994.

234.   Shortly after Sharrif's conviction, he was transported by detectives to a meeting with ADA Suzanne Mondo at the Kings County District Attorney's Office.

235.   At that meeting, ADA Mondo explained to Sharrif that he was facing 27-years-to-life imprisonment but that she would reduce the punishment to nine-years-to-life if he would be willing to testify against Antonio Yarbough.

236.   At the meeting, Sharrif advised ADA Mondo and the detectives present that he was innocent of the crime and that he had told the truth at trial.

237.   Upon information and belief, the detectives again misled the prosecutors or failed to correct their prior misrepresentations about the circumstances of Sharrif's false confessions.

238.   Sharrif, who was desperate and terrified after almost two years in juvenile facilities on Rikers Island, reluctantly agreed to testify falsely against Antonio.

239.   Antonio was tried twice. The first trial began just two days after Sharrif's conviction. That trial lasted five days and Sharrif testified falsely against Antonio for the prosecution. The trial ended in a hung jury.

240.   After Antonio's first murder trial, Sharrif was interviewed by probation officer Alan Arfer, who was preparing a presentence investigation report for the court in connection with Sharrif's sentencing. In that interview, Sharrif truthfully and emphatically denied his guilt, effectively recanting his false testimony against Antonio.

241.   Antonio stood trial a second time, from February 8 through February 16, 1994. Sharrif again testified falsely for the prosecution and the prosecution presented the videotape of Sharrif's false confession.

242.   At both of Antonio's trials, detectives testified falsely about the circumstances of Sharrif's false confession. At Antonio's second trial, based on the detectives' claims, prosecutor Suzanne Mondo falsely asserted that just hours after the murders, "Sharif Wilson [gave] an incredibly long and detailed confession[.]"

49

243.   At both of Antonio's trials, detectives testified falsely about the circumstances of Antonio's false written confession.

244.   The only evidence connecting Antonio to the crime that was presented at either trial was the false statement written by the police that he signed and Sharrif's false testimony, along with false police testimony about how the statements were elicited.

**O.   Detectives and Prosecutors Coerce and Manipulate Major Yarbough and Clara Knox into Changing their Stories and Testifying Falsely**

245.   Detectives coerced and manipulated Major Yarbough into changing his story about what happened on the morning of June 18, 1992.

246.   Specifically, Major Yarbough told detectives that Antonio approached him in tears at 6:45 a.m.

247.   Upon information and belief, after coaching by detectives, Major Yarbough changed his account and falsely testified that Antonio approached him at 7 a.m.

248.   Detectives intentionally procured Major Yarbough's false testimony because they knew their theory that the murders all took place within a 15-minute time frame was not plausible.

249.   Similarly, detectives coerced Clara Knox into giving false testimony at trial.

250.    Specifically, Clara Knox told detectives that she observed Annie Yarbough and a Hispanic man using intravenous drugs at approximately 1 a.m. on June 18, 1992, while her 12-year-old granddaughter, Latasha Knox, was sleeping in the next room.

251.    At trial, Clara Knox falsely testified that Annie Yarbough and the unidentified man were discussing politics and not using drugs.

252.    Clara Knox is the grandmother of the victim Latasha Knox. Latasha Knox was killed after Clara Knox failed to remove Latasha Knox from the apartment after seeing Annie and the unidentified male using intravenous drugs there.

253.    Upon information and belief, the defendants told Clara Knox not to testify that she saw a male using intravenous drugs at the apartment at or around the time of the homicides. Upon information and belief, Clara Knox concealed this information from the jury because she feared the defendants might charge her with a crime such as endangering the welfare of a child if she testified truthfully.

**P.      Officer Ricky Bradford Falsely Tells Prosecutors that Antonio Appeared Calm and Unaffected After the Murders**

254.    When Officer Ricky Bradford first arrived at the scene on June 18, 1992, he observed Antonio in tears and obviously upset and emotional.

255.   Nonetheless, Officer Bradford misrepresented in police reports, pretrial communications with prosecutors, and trial testimony that Antonio's demeanor was "very flat," that he appeared "calm," and that he was not crying shortly after he discovered his family had been murdered.

**Q.   Antonio Yarbough is Convicted, Sentenced to 75-Years-to-Life and Sent to Attica Correctional Facility**

256.   Based on the false testimony presented at trial by the police and prosecutors, the first trial of Antonio Yarbough ended in a hung jury in late January or early February 1994.

257.   Based on the false testimony presented at trial by the police and prosecutors, the second trial of Antonio Yarbough ended in a conviction on February 16, 1994.

258.   On February 22, 1994, Sharrif Wilson was sentenced to three indeterminate terms of nine years to life imprisonment, to run concurrently. He was 17 years old.

259.   On March 15, 1994 Antonio Yarbough was sentenced to 75-years-to-life in prison. He was 19 years old.

**R.     DNA Evidence Proves that Antonio Yarbough is Actually Innocent of the Crime Charged and that His Conviction Was Wrongfully Procured**

260.   Both Sharrif and Antonio appealed their convictions. Both appeals were denied.

261.   In 2005, Sharrif Wilson, now almost 30 years old, wrote to Antonio's aunt Sandra Vivas, again disavowing his confession, recanting his trial testimony against Antonio, and apologizing.

262.   In 2009 Antonio contacted attorney Zachary Margulis-Ohnuma through his cellmate. After investigation, Mr. Margulis-Ohnuma filed papers pursuant to New York Criminal Procedure Law § 440.10 moving to vacate Antonio's conviction or, in the alternative, for DNA testing.

263.   The initial § 440.10 motion was denied on procedural grounds, but the People agreed to DNA testing and Antonio moved to renew and reargue.

264.   In late 2012, numerous items of physical evidence collected at the crime scene were made available for DNA testing, including biological material recovered from Annie Yarbough's fingernails.

265.   The motions to renew and reargue were still pending when the Office of the Chief Medical Examiner of the City of New York disclosed a DNA "hit report" in August 2013.

266.   The OCME had identified a single-source male DNA profile in the biological material recovered from Annie Yarbough's fingernails.

267.   Based on testing of reference samples from Sharrif Wilson and Antonio Yarbough, the OCME excluded either Sharrif or Antonio as the source of that DNA profile.

268.   In other words, DNA testing revealed that biological material had been left by one man under Annie Yarbough's fingernails before she died, and that this unidentified man was neither Sharrif Wilson nor Antonio Yarbough.

269.   OCME compared the male DNA profile recovered from Annie Yarbough's fingernails to samples from unsolved crimes. The DNA taken from under Annie Yarbough's fingernails matched the DNA profile of semen found inside the body of Migdalia Ruiz, a drug user and prostitute whose was found murdered in Sunset Park, Brooklyn, in 1999.

270.   At the time Migdalia Ruiz was killed in 1999, Antonio and Sharrif were both in state prison.

271.   Migdalia's Ruiz's murder has never been solved. However, she was killed in a manner that is strikingly similar to the way Annie Yarbough and the two girls were killed. Like Annie Yarbough, Migdalia Ruiz was a drug addict who was last seen alive late at night in the company of two male

drug users. Like Annie Yarbough, Migdalia Ruiz was found the next morning in a residential area, strangled with a ligature wrapped around her neck. Like the two girls, Migdalia Ruiz was found partially, but not completely, disrobed.

272.    The DNA evidence from Annie Yarbough's fingernails proved that the statement Antonio signed, Sharrif's videotaped confession, and Sharrif's testimony at Antonio's two trials were all false. None of these statements ever described any third person involved in the murders.

273.    Based on the new DNA evidence and other materials submitted in the motion papers in 2010 and 2013, the Kings County District Attorney's Office dropped the People's opposition to Antonio's motion on February 6, 2014. At the hearing that day, an assistant district attorney stated that "any further prosecution of the defendants [would be] both impractical and unjust."

274.    That day, Justice Raymond Guzman of New York State Supreme Court, Kings County, granted the motion, vacating the convictions and dismissing the indictments with prejudice pursuant to Criminal Procedure Law § 440.10(1)(g).

275.    Antonio Yarbough and Sharrif Wilson were freed from state custody on February 6, 2014.

## Damages

276.   Antonio is permanently injured by the psychological torture committed by the defendants on June 18, 1992 and the 21 years, seven months and 19 days that he was wrongfully imprisoned for the murder of his family.

277.   Antonio suffered adverse health consequences while he was in prison as a direct result of the defendants' wrongful conduct that led to his false conviction.

278.   Antonio suffers from depression and other specific psychological disorders both as a direct result of the psychological torture inflicted by the defendants and as a result of his nearly twenty two years in maximum security prisons in New York State.

279.   Antonio is being treated for these disorders.

280.   Antonio was assaulted on multiple occasions while he was in prison.

281.   Antonio was denied an opportunity to adequately mourn the loss of his mother and sister from the time of their deaths until after February 6, 2014.

282.   Antonio lost 21 years, seven months and 19 days worth of wages he would otherwise have earned.

283.   The wrongful conduct of the police led directly to the murder of Migdalia Ruiz because if the detectives had properly investigated the murders of Annie Yarbough, Latasha Knox and Chavonn Barnes at the time, they would have found the true murderer and prosecuted him, preventing him from killing Migdalia Ruiz.

284.   As a direct result of the defendants' intentional, bad faith, willful, wanton, reckless and deliberately indifferent acts and omissions, Antonio sustained injuries and damages, including but not limited to loss of his freedom for almost twenty-two years, loss of his youth, personal injuries, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

## FEDERAL CLAIMS

**COUNT I: 42 U.S.C. § 1983 Fifth and Fourteenth Amendment Claims for Violation of Antonio's Right Against Involuntary Self-Incrimination, His Right Not to be Deprived of Liberty as a Result of the Fabrication of Evidence by a Government Investigator, His Right to a Fair Trial, and His Right Not to be Deprived of Liberty without Due Process of Law**

285.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

286.   Defendants Luongo, Grimaldi, DeCarlo, McMahon, Williams, Izzo, Veneaiza, and Bradford, acting individually and in concert, deliberately coerced a false confession from Antonio, fabricated inculpatory evidence against Antonio, and withheld material exculpatory and impeachment evidence from prosecutors. Defendants thereby deprived Antonio of his clearly established rights under the Fifth and Fourteenth Amendments of the United States Constitution, including but not limited to: his right against involuntary self-incrimination, his right not to be deprived of liberty as a result of the fabrication of evidence by a government investigator, his right to a fair trial, and his right not to be deprived of liberty without due process of law.

## A. Coercion

287.   Defendants Luongo, Grimaldi, DeCarlo, McMahon, Williams, and Izzo, acting individually and in concert, deliberately, recklessly, or intentionally coerced and compelled allegedly inculpatory statements from Antonio and caused those coerced statements to be introduced against him in criminal proceedings, to obtain his indictment and prosecution, in violation of Antonio's Fifth and Fourteenth Amendment rights not to be compelled to be a witness against himself, not to be deprived of liberty without due process of law, and to a fair trial.

288.   Defendants Grimaldi, DeCarlo, McMahon, Williams, and Izzo interrogated eighteen-year-old Antonio Yarbough in the 60th Precinct for hours on June 18, 1992. During the interrogation, Antonio was in the defendant detectives' custody. The defendants took Antonio to a small, windowless room, where he was questioned by three or more detectives at a time, and was not free to leave. A reasonable person in Antonio's position would have perceived his freedom to be significantly restricted and would not have understood himself to be free to leave.

289.   Defendants Grimaldi, DeCarlo, McMahon, Williams, and Izzo employed coercive and manipulative interrogation techniques designed to overbear Antonio's will.

290.   Because of defendants' coercion, physical abuse, and manipulation, Antonio's will was overborne such that the "confession" was not the product of his free will and rational intellect.

291.   The end result of the coercive interrogation, the signed "confession," was used against Antonio before the grand jury, during pretrial hearings, and at two criminal trials. It was a centerpiece of the prosecution.

292.   The defendant officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Antonio's constitutional rights and innocence.

293.   No reasonable officer in 1992 would have believed this conduct was lawful.

294.   As a direct and proximate result of defendants' actions, Antonio was indicted, tried, wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous and continuing damages and injuries set forth above.

**B. Fabrication of Evidence**

295.   Defendants Grimaldi, DeCarlo, McMahon, Luongo, Williams, Izzo, Veneaiza, Bradford and Arden deliberately fabricated inculpatory evidence against Antonio, including Sharrif's oral and videotaped

"confession," Antonio's written "confession," and details about Sharrif and Antonio's conduct on the morning of June 18, 1992, thereby depriving Antonio under the Fourteenth Amendment of: his right to be free from deprivation of liberty as a result of the fabrication of evidence by a government investigator; his right to be free from deprivation of liberty without due process of law; and his right to receive a fair trial. Each of the fabrications described herein was used against Antonio to cause his convictions.

296.   The defendant officers and medical examiner performed the acts described above under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Antonio's constitutional rights and innocence. No reasonable officer or medical examiner in 1992 would have believed this conduct was lawful.

297.   As a direct and proximate result of defendants' actions, Antonio was indicted, tried, wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous and continuing damages and injuries set forth above.

## C. Failure to Disclose Exculpatory and Impeachment Evidence to the Prosecution

298.   Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, and Luongo suppressed material exculpatory and impeachment information from the prosecution and defense, including without limitation the facts that (1) the interrogating defendants fed both Sharrif and Antonio non-public details about the crime and falsely claimed that those incriminating facts originated with each of the defendants; and (2) the interrogating defendants coerced false confessions from both Sharrif and Antonio, by use of physical and verbal threats, false promises, homophobic slurs and other conduct described above.

299.   Defendant Medical Examiner Arden suppressed materially exculpatory and impeachment information from the prosecution and defense, including without limitation the fact that the condition of the bodies at the time they were found indicated that the murders had occurred prior to 4:30 a.m. on June 18, 1992, a time period for which Sharrif and Antonio had confirmed alibis.

300.   The defendant officers and medical examiner performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Antonio's

constitutional rights and innocence. No reasonable officer or medical examiner in 1992 would have believed this conduct was lawful.

301.   As a direct and proximate result of defendants' actions Antonio was indicted, tried, wrongly convicted and imprisoned for almost twenty-two years, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT II: 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Malicious Prosecution

302.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

303.   Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Murnane, Bradford, Veneaiza, and Luongo, with malice and knowing that probable cause did not exist to arrest Antonio and prosecute him for the murders of Annie Yarbough, Chavonn Barnes, and Latasha Knox, acting individually and in concert, caused Antonio to be arrested, charged, and prosecuted for that crime, thereby violating Antonio's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures.

304.   Specifically, defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, and Luongo, with malice, knew or in the absence of their

deliberate and reckless indifference to the truth should have known that probable cause did not exist to arrest and prosecute Antonio, including but not limited to the facts that Antonio's allegedly inculpatory statements were not the product of his free will and rational intellect, that allegedly inculpatory evidence had been fabricated by the defendants (including the false accusation by Sharrif against Antonio, which was not a product of Sharrif's free will), and that those factors as well as additional material exculpatory and impeachment evidence which defendants did not disclose to the grand jury or prosecutors undermined the evidence presented in support of a probable cause finding against Antonio.

305.   In addition, the defendant officers, with malice, acting individually and in concert, knowingly and intentionally misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury that vitiated probable cause against Antonio, including but not limited to the fact that the detectives fed Sharrif and Antonio non-public facts about the crimes that Sharrif and Antonio did not and could not have known, and that the detectives manipulated and coerced Sharrif and Antonio into adopting those facts in the so-called "confessions."

306.   The defendant officers performed the above-described acts with malice, under color of state law, deliberately, intentionally, or with reckless disregard for the truth and Antonio's rights.

307.   Defendants initiated and continued the prosecution against Antonio without probable cause, in violation of Antonio's clearly established constitutional rights.

308.   No reasonable officer in 1992 would have believed this conduct was lawful.

309.   Antonio is innocent of the murders of Annie Yarbough, Chavonn Barnes, and Latasha Knox.

310.   The prosecution finally terminated in Antonio's favor on February 6, 2014, when his conviction was vacated and the indictment against him was dismissed with prejudice.

311.   As a direct and proximate result of defendants' conduct, Antonio was maliciously prosecuted, wrongly convicted and imprisoned for almost twenty-two years, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III: 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Failure to Investigate Available Exculpatory Evidence, under *Russo v. City of Bridgeport*

312.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

313.   Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Murnane, Bradford, Veneaiza, Luongo, and the John and Jane Doe officers and supervisors, acting individually and in concert, ignored the facts in front of them and failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Antonio's prosecution.

314.   The deliberate and reckless investigative failures of the defendants included, but were not limited to: failing to identify and investigate the men who were in Annie Yarbough's apartment using drugs and arguing the night of the crime, including failing to investigate the man who threatened Annie Yarbough with a knife that night and with whom Ms. Yarbough and the two girls were last seen alive; failing to identify and investigate any of the people with whom Annie Yarbough attended the Coney Island Hospital's methadone clinic, including those whom witnesses identified as being present at Annie Yarbough's apartment the night of the murders; and failing to investigate exculpatory and potentially exculpatory

medical and forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence.

315.   Antonio Yabrough is innocent of the murders of Annie Yarbough, Chavonn Barnes, and Latasha Knox.

316.   Despite his innocence and the absence of probable cause to prosecute him, Antonio was held from his arrest on June 18, 1992 until the prosecution against him finally terminated in his favor on February 6, 2014, when his conviction was vacated and the indictment against him was dismissed with prejudice.

317.   The defendant detectives, officers, and supervisors' deliberate and reckless failure to investigate deprived Antonio of his clearly established constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution, including but not limited to his right not be subject to unreasonable seizures.

318.   The defendant officers performed the above-described acts under color of state law, deliberately, recklessly, with malice, and with deliberate indifference or reckless disregard for Antonio's constitutional rights and innocence. No reasonable officer in 1992 would have believed this conduct was lawful.

319.   As a direct and proximate result of defendants' conduct, Antonio was maliciously prosecuted, wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT IV: 42 U.S.C. § 1983 Civil Rights Conspiracy

320.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

321.   Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Murnane, Bradford, Veneaiza, and Luongo, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Antonio of: (1) his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law, and to receive a fair trial; and (2) his First and Fourteenth Amendment rights of access to courts and executive clemency.

322.   In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

i)  Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Veneaiza, and Bradford deliberately fabricated inculpatory

evidence, including but not limited to their claim that the non-public facts in the confessions originated with Sharrif and Antonio; falsified reports and other accounts of their investigative activities and the interrogations of Sharrif and Antonio; and failed to document and disclose material exculpatory evidence to prosecutors;

ii) Defendants Grimaldi, DeCarlo, Williams, McMahon and John Doe #1 overbore Antonio's will and coerced him into signing a false statement about the murders by illegally taking advantage of his young age, his inexperience, and his exhaustion; falsely telling him that he could go home if he told them what they wanted to hear; repeatedly hitting him on his head; threatening him with further violence; and feeding him non-public facts about the crimes;

iii) Defendants Grimaldi, DeCarlo, McMahon and Williams coerced Sharrif into creating a false videotape implicating Antonio and himself and into testifying falsely against Antonio;

iv) Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Murnane and Luongo failed to properly investigate the drug-using stranger who was in Annie Yarbough's apartment when she and the girls were last seen alive and who had threatened Annie

Yarbough with a knife in her apartment on the night she was

killed;

v) Defendants Grimaldi, Williams, McMahon, Luongo, and Bradford

deliberately provided perjured testimony in the grand jury, pretrial

hearings, and in Antonio's criminal trial, consistent with their out-

of-court misrepresentations in documents and other official

communications.

323.   As a direct and proximate result of defendants' actions Antonio

was wrongly convicted and imprisoned for almost twenty-two years and

suffered the other grievous and continuing damages and injuries set forth

above.

## COUNT V: 42 U.S.C. §1985(3) Conspiracy

324.   Plaintiff hereby incorporates by reference all of the foregoing

paragraphs and further alleges as follows:

325.   Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit,

Murnane, Bradford, Veneaiza, and Luongo, and others yet unknown,

violated Antonio's clearly established rights under 42 U.S.C. § 1985(3),

when, motivated by racial and sexual-orientation-based animus—as

evidenced in part by their use of homophobic and racial slurs during their

coercive interrogation of Antonio and by the homophobia evident in their

fabricated and baseless theory of a crime motivated by Antonio and Sharrif's homosexuality—defendants agreed among themselves to act in concert to deprive Antonio of the equal protection of the laws.

326. In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

i) Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, and Luongo deliberately fabricated inculpatory evidence, including without limitation the claim that the non-public facts in the confessions originated with Sharrif and Antonio and the false narrative that Sharrif and Antonio's motivation for the murders was Sharrif and Antonio's sexual orientation and supposed conflict with Antonio's mother over his sexuality; falsified reports and other accounts of their investigative activities and the interrogations of Sharrif and Antonio; and failed to document and disclose material exculpatory evidence to prosecutors;

ii) Defendants Grimaldi, DeCarlo, and McMahon overbore Sharrif's will and coerced him into falsely confessing and implicating Antonio in the murders by illegally taking advantage of his young age, his inexperience, and his exhaustion; falsely telling him that he could go home if he just told them what they wanted to hear;

71

repeatedly hitting him on his head; feeding him the interrogating

detectives' fabricated motive for the crime based on Sharrif and

Antonio's sexuality; and feeding him non-public facts about the

murders that had been withheld from the public;

iii) Defendants Grimaldi, DeCarlo, and McMahon overbore Antonio's

will and coerced him into signing a false confession to the murders

by fabricating a written confession for Antonio's signature that

included the false narrative of Antonio's and Sharrif's sexuality-

driven motive for the murders, barraging Antonio with

homophobic and racial slurs and threats of violence, threatening

him with a service revolver, and taking advantage of his youth, his

inexperience, and his grief.

327.   As a direct and proximate result of defendants' actions, Antonio
was wrongly convicted and imprisoned for almost twenty-two years and
suffered the other grievous and continuing damages and injuries set forth
above.

## COUNT VI: 42 U.S.C. § 1983 Failure to Intercede

328.   By their conduct and under color of law, the defendant officers
and supervisors had opportunities to intercede on behalf of Antonio to
prevent the violation of Antonio's right against involuntary self-

incrimination, his malicious prosecution, and the deprivation of his liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so. The defendant officers and supervisors' failures to intercede violated Antonio's clearly established constitutional rights, including but not limited to his right against involuntary self-incrimination and not to be deprived of liberty without due process of law as guaranteed by the Fifth and Fourteenth Amendments.

329.   The defendant officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Antonio's constitutional rights and innocence. No reasonable officer in 1992 would have believed this conduct was lawful.

330.   As a direct and proximate result of defendants' actions Antonio was indicted, tried, wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VII: 42 U.S.C. § 1983 Supervisory Liability

331.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

332.   Defendant Luongo, and John and Jane Doe supervisors, acting within the scope of their employment and under color of state law, were personally involved in the case against Antonio, represented that they personally observed and supervised Antonio's interrogation, and knew, or in the absence of their deliberate indifference, recklessness, and gross negligence should have known, that their subordinate officers had deprived Antonio of his clearly established constitutional rights through misconduct that included but was not limited to coercing and fabricating a "confession" from Antonio; coercing Sharrif into testifying against Antonio; deliberately ignoring evidence of Antonio's innocence; failing to properly investigate the drug-using stranger who was in Annie Yarbough's apartment when she and the girls were last seen alive and who had threatened Annie Yarbough with a knife in her apartment on the night she was killed, and violating their ongoing affirmative obligation to come forward with evidence of innocence and the truth of their own misconduct.

333.   Defendant Luongo and the John and Jane Doe supervisory Defendants, by deliberately and/or recklessly failing to supervise their subordinate officers, and by their active and direct participation in and facilitation of their subordinates' misconduct, caused their subordinates to deprive Antonio of his clearly established constitutional rights, including but

not limited to his right not to be compelled to be witness against himself, to be free from unreasonable searches and seizures, not to be deprived of liberty without due process of law, and to have access to the courts and executive clemency.

334.   Moreover, Lt. Luongo and the John and Jane Doe supervisory defendants allowed their subordinates to act with impunity in an environment in which those subordinates were not supervised, disciplined, or trained, and in which those subordinates knew that their violations of Antonio's constitutional rights would be facilitated, approved, and/or condoned by Luongo and the other supervisory defendants.

335.   Defendant Luongo and the John and John Doe supervisory defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1992 would have believed that the supervisory defendants' actions were lawful.

As a direct and proximate result of defendant Luongo and the John and Jane Doe supervisory defendants' actions, Antonio was wrongly prosecuted, convicted, and imprisoned for almost twenty-two years and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT VIII: 42 U.S.C. § 1983 Monell Claim for Unconstitutional Custom or Policy

336.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

337.   The City of New York, by and through its final policymakers, had in force and effect during the Yarbough, Barnes, and Knox murder investigation and for years beforehand, a policy, practice or custom of unconstitutional misconduct in homicide investigations, including the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; and, particularly, the fabrication of incriminating statements from witnesses, suspects, and arrestees by feeding non-public facts about the crime that only the police and the true perpetrator would know to those witnesses, suspects, and arrestees.

338.   Final policymakers for the City of New York had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; fabricating inculpatory evidence, and, particularly, fabricating incriminating statements from witnesses, suspects, and arrestees by feeding non-public facts about the crime that only the police and the true perpetrator would know to those witnesses, suspects, and arrestees. The continued adherence to these

76

unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Antonio.

339.   Such unconstitutional municipal customs, practices and/or policies were the moving force behind both Antonio and Sharrif's false, coerced and fabricated confessions, and Sharrif's false testimony against Antonio, which caused Antonio's arrest, prosecution, and almost twenty-two years of incarceration, as well as all the ongoing injuries and damages set forth above.

## STATE LAW CLAIMS

### COUNT IX: Malicious Prosecution

340.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

341.   Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Murnane, Bradford, Veneaiza, and Luongo, with malice and despite knowing that probable cause did not exist to arrest and prosecute Antonio for the murders of Annie Yarbough, Chavonn Barnes, and Latasha Knox, acting individually and in concert, caused Antonio to be arrested, charged, prosecuted, and convicted for the murders. Specifically, the defendants intentionally and knowingly misrepresented the truth and withheld

exculpatory facts from prosecutors and the grand jury that vitiated probable cause against Antonio, including but not limited to the fact that they fed Sharrif and Antonio non-public facts about the crime Sharrif and Antonio did not and could not have known, and that they manipulated and coerced Sharrif and Antonio into adopting those facts in their so-called "confessions."

342.   Antonio Yarbough is innocent of the murders.

343.   Antonio's cause of action for malicious prosecution was unavailable to him until his prosecution finally terminated in his favor on February 6, 2014, when his conviction was vacated and the charges against him were dismissed.

344.   Defendants engaged in these acts within the scope of their employment.

345.   As a direct and proximate result of defendants' actions, Antonio was wrongly convicted and imprisoned for almost twenty-two years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT X: Intentional, Reckless or Negligent Infliction of Emotional Distress

346.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

347.   The improper, deliberate and traumatizing conduct of defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, and Luongo, during the interrogation of Antonio, as well as their conduct in deliberately causing, or recklessly disregarding the risk of causing, the wrongful prosecution, conviction, incarceration, and concomitant severe emotional distress, was extreme and outrageous, and directly and proximately caused the grievous and continuing injuries and damages set forth above.

348.   In the alternative, defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Murnane, Bradford, Veneaiza, and Luongo, negligently and grossly negligently, and in breach of their duties owed to Antonio to, *inter alia*, report accurately the information given to him and his own statements and the circumstances underlying such statements; report accurately the information taken from other witnesses and their investigative responses to such information; and refrain from fabricating evidence, coercing and manipulating Antonio, withholding material exculpatory and impeachment evidence, and otherwise acting to deny Antonio due process of law, directly and proximately caused Antonio, an innocent teenager, to be

falsely arrested, maliciously prosecuted, and wrongly imprisoned for more than two decades. Defendants' actions unreasonably endangered Antonio's physical health and safety, and caused him to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

349.   Defendants engaged in these acts within the scope of their employment.

350.   The statutes of limitations on these claims are tolled as defendants concealed from Antonio – and still are concealing to this day— their conduct giving rise to this cause of action.

## COUNT XI: Negligence

351.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

352.    Defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Murnane, Bradford, Veneaiza, and Luongo are liable for negligence, having breached their duty of reasonable care to Antonio, an innocent teenager.

353.   Specifically, and by way of example, defendants: (a) failed to ensure that they did not contaminate Antonio's confession by providing him

with non-public facts about the murder; (b) failed to report accurately the circumstances of Antonio's interrogation, including information they provided to Antonio and information originating with Antonio; (c) failed to take adequate care in interviewing Antonio and Ron Carrington to ensure that their stories were truly inconsistent prior to aggressively interrogating Antonio and Sharrif; and (c) failed to properly investigate the drug-using stranger who was in Annie Yarbough's apartment when she and the girls were last seen alive and who had threatened Annie Yarbough with a knife in her apartment on the night she was killed.

354.   Defendant Arden is liable for negligence, having breached his duty of reasonable care to Antonio, an innocent teenager.

355.   Specifically, and by way of example, Dr. Arden: (a) failed to investigate or failed to document investigation of basic pertinent information regarding time of death, including what the credible evidence indicated about when the three victims had last been seen alive; (b) failed to report that based on the condition of the bodies at the time they were found, his autopsy findings, and other information available to him, he was aware that the medical evidence demonstrated that the murders had occurred prior to 4:30 a.m. on June 18, 1992, in contradiction to Sharrif and Antonio's confessions and when they both had independently corroborated alibis; and

(c) failed to include any opinion about time of death in his autopsy reports for Annie Yarbough, Chavonn Barnes, and Latasha Knox.

356.   Defendants' negligence and gross negligence directly and proximately caused Antonio, an innocent teenager, to be wrongly prosecuted and imprisoned for more than two decades.

357.   Defendants engaged in these acts within the scope of their employment.

358.   Antonio Yarbough is innocent of the murders.

359.   Antonio's cause of action for negligence was unavailable to him until his prosecution finally terminated in his favor on February 6, 2014, when his conviction was vacated and the charges against him were dismissed.

360.   Furthermore, the statute of limitations for this claim is tolled as defendants concealed—and still are concealing to this day—their conduct giving rise to this cause of action.

## COUNT XII: *Respondeat Superior* Claim Against the City of New York

361.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

362.    At all times relevant to this Complaint, defendants Grimaldi, DeCarlo, McMahon, Williams, Izzo, Feit, Murnane, Bradford, Veneaiza,

Luongo, Arden and John Doe #1 acted as agents of the City of New York, in furtherance of the business, including law enforcement functions, of the City of New York, and within the scope of their employment or agency with City of New York.

363.   The conduct by which the defendant officers committed the torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence was not undertaken for the defendant officers' personal motives, but rather was undertaken while the defendant officers were on duty, carrying out their routine investigative functions as detectives and police officers, and engaging in such conduct as would have been reasonably expected by the City of New York. The conduct of the individual defendants in committing the above-described torts was reasonably foreseeable by the City of New York.

364.   Under the doctrine of *respondeat superior*, the City of New York is liable for their agents' state law torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence.

**WHEREFORE**, ANTONIO YARBOUGH, demands judgment in a sum to be determined at trial and is further entitled to punitive damages against the individual defendants in an amount to be determined at trial, plus reasonable attorney's fees, costs, and disbursements of this action.

Dated:      New York, New York
            February 2, 2015

                    LAW OFFICE OF ZACHARY MARGULIS-
                    OHNUMA


                    BY: *Zachary Margulis-Ohnuma*
                    ZACHARY MARGULIS-OHNUMA
                    260 Madison Avenue, 17th Floor
                    New York, NY 10016
                    (212) 685-0999

                    LAW OFFICE OF PHILIP J. SMALLMAN


                    BY: *Philip J. Smallman*
                    PHILIP J. SMALLMAN
                    32 Court St. #705
                    Brooklyn NY 11201
                    (718) 222-3073

                    *Attorneys for Plaintiff Antonio Yarbough*